UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 21cr10294 |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| THOMAS NEE, | ) | Count One: Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds |
| | ) | |
| Defendant | ) | |
| | ) | (18 U.S.C. § 371) |
| | ) | |
| | ) | Count Two: Theft Concerning Programs Receiving Federal Funds; Aiding and Abetting |
| | ) | |
| | ) | |
| | ) | (18 U.S.C. §§ 666(a)(1)(A) and 2) |
| | ) | |
| | ) | Forfeiture Allegation: |
| | ) | (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

### The Boston Police Department

1. The Boston Police Department ("BPD") was the police department for the City of Boston and the oldest police department in the United States. It was the largest police department in New England and approximately the 20th largest department in the country.

2. The BPD had the authority to enforce the criminal laws of the Commonwealth of Massachusetts and the local rules and ordinances of the City of Boston.

### The BPD Received Federal Benefits

3. For the calendar years 2015 through 2019, the BPD received annual benefits from

1

the federal government in excess of $10,000.

4. For example, the United States Department of Transportation ("DOT") was an agency of the United States that provides hundreds of thousands of dollars in funding on a yearly basis to law enforcement authorities to benefit the residents of the United States. DOT provided funding to assist and enhance enforcement of traffic regulations on public roadways for the purpose of increasing public well-being and safety.

5. For the calendar years 2015 through 2019, the BPD received annual benefits from the DOT in excess of $10,000. DOT provided these funds through numerous federal grants.

6. The United States Department of Justice ("DOJ") was an agency of the United States that provided hundreds of thousands of dollars in funding on a yearly basis to law enforcement authorities to benefit the residents of the United States.

7. For the calendar years 2015 through 2019, the BPD received annual benefits from the DOJ in excess of $10,000. DOJ provided these funds through numerous federal grants.

## BPD Evidence Warehouse

8. The BPD leased two buildings located at 1555 Hyde Park Avenue which served as the BPD Evidence Warehouse (the "Warehouse"). The Warehouse was used, among other things, to store seized evidence.

9. Officers of the Boston Police Evidence Control Unit ("ECU") were assigned to the Warehouse and were primarily responsible for, among other things, storing, cataloging, and retrieving the evidence at the Warehouse so it could be used in court proceedings and as otherwise needed by the BPD.

10. The Warehouse was extensively alarmed. The alarm system was maintained by the Boston Municipal Protective Services Department, which provided security for almost all buildings owned and controlled by the City of Boston (*i.e.*, Police Stations, Fire Stations, City Hall, Schools, Libraries, etc.).

11. Once the Warehouse's perimeter alarm was set, no one could remain in the building without triggering the alarm.

12. Data from the alarm system, including when it was set and disarmed on a given date, was maintained on servers by the Boston Municipal Protective Services Department.

## The Defendant and His Co-Conspirators

13. From at least February 2015 to at least February 2018, Thomas Nee ("T. Nee") was a police officer in the BPD assigned to the ECU.

14. From at least February 2015 through approximately April of 2016, T. Nee worked under the command of a Captain, "Captain A," who was in overall command of the Warehouse.

15. From approximately May 2016 through approximately February 2018, T. Nee worked under the command of a Lieutenant, "Lieutenant B," who was in overall command of the Warehouse.

16. From approximately March 2015 through approximately June 2016, T. Nee also worked with a Sergeant, "Sergeant C," at the Warehouse.

17. From approximately March 2015 through approximately January 2017, T. Nee also worked with a second Sergeant, "Sergeant D."

18. From approximately December 2016 through approximately February 2018, Sergeants E and F were assigned to the Warehouse under the command of Lieutenant B.

19.     From at least January 2015 through February 2019, numerous other police officers were assigned to the ECU, identified herein as BPD Officers #1 through #14 ("BPD PO #1 to #14").

### Overtime

20.     In addition to their salary for a regular 8-hour work shift, Monday through Friday from 7:30 a.m. to 4:00 p.m., officers of the ECU were able to earn overtime pay equivalent to 1.5 times their regular hourly pay rate for various overtime assignments.

21.     In order to be paid for overtime, officers of the ECU were required to fill out an overtime slip. The overtime slip contained entries for, among other things, the officer's name and identifying information, the type of overtime being performed, the location where the overtime was being performed, the date of the overtime, and the hours of the overtime shift. In addition, each overtime slip required the officers to specifically write the number of "**Actual Hours Worked**." The entry for "actual hours worked" is both bolded and underlined on the overtime slip. Officers had a duty to honestly fill out each overtime slip and were required to sign the form.

22.     In order for an officer of the ECU to be paid for overtime, the officer's supervisors were required to sign each overtime slip certifying that the overtime was authorized and that the officer actually worked the hours that the officer claimed to have worked.

23.     Supervisors, such as Captain A, Lieutenant B, Sergeant C, Sergeant D, Sergeant E, and Sergeant F, had a duty to certify only those hours actually worked by themselves and/or their subordinates.

"Purge" and "Kiosk" Overtime

24. Beginning by at least January 2015, and continuing through at least February 2019, officers of the ECU could earn overtime pay for a 4-8 p.m. overtime shift most commonly referred to as "purge" overtime. The primary purpose of this overtime shift was to control and reduce the inventory of the Warehouse. At various times, the 4-8 p.m. overtime shift also included efforts to scan and catalog the inventory of the Warehouse and dispose of seized narcotics.

25. This 4-8 p.m. "purge" overtime shift frequently involved five or more officers of the ECU – at least one supervisor and often four or more officers – who all worked together inside the Warehouse.

26. Beginning by at least January 2015 and continuing through February 2019, ECU officers could also perform what was referred to as "kiosk" overtime. This overtime shift was available approximately once per month on a Saturday, from 7:30 a.m. to 4 p.m. before June 2016, and from 6 a.m. to 2:30 p.m. thereafter. "Kiosk" overtime involved two officers of the ECU traveling to each district within the city to collect materials, such as unused prescription drugs, from a "kiosk" located in each district. These materials would then be taken by the two officers of the ECU to an incinerator located in Saugus, and burned.

27. The "purge" overtime shifts, and the "kiosk" overtime shifts, were "hour for hour" overtime, which meant that the overtime was earned in fifteen-minute increments. To properly earn four hours of overtime for the "purge" overtime shift, officers of the ECU were required to work a minimum of three hours and forty six minutes, and, to properly earn eight and one half hours of "kiosk" overtime, the officers of the ECU were required to work a minimum of

eight hours and sixteen minutes.

### Kiosk Overtime Incinerator Records

28. The incinerator used by the ECU to dispose of the materials collected during "kiosk" overtime recorded the date and time of customers' arrival to and departure from the incinerator.

29. The vehicles of customers using the incinerator were weighed at the time that the vehicles entered and exited the facility.

30. The difference in weight between entry and departure allowed the company to create an invoice for the amount of material burned.

### The Ballistics Unit

31. In addition to the officers of the ECU, two officers of the Ballistics Unit were also assigned to the Warehouse. Those officers were responsible for the storing, cataloging, and retrieving of older firearms stored within the Warehouse.

32. Like the members of the ECU, the two members of the Ballistics Unit were eligible to perform overtime from 4-8 p.m., though often less frequently than the members of the ECU.

33. Unlike the members of the ECU, members of the Ballistics Unit were not provided alarm codes for the Warehouse and were not permitted to be present in the Warehouse when the members of the ECU chose to leave.

34. This meant that the members of the Ballistics Unit were often required to leave prior to the end of their scheduled overtime shifts when the members of the ECU decided to leave early.

## Overview of the Conspiracy

35.     From at least January 2015 through in or about February 2019, T. Nee and co-conspirators known and unknown to the United States Attorney engaged in a conspiracy to embezzle funds by submitting false and fraudulent overtime slips in which they claimed to have worked a full "purge" or "kiosk" overtime shift when in fact they did not.

36.     Supervisors in the ECU, such as Captain A, Lieutenant B, and Sergeants C, D, E, and F, routinely agreed to endorse overtime slips for themselves and their subordinates certifying that they and their subordinates had worked a full four hour "purge" shift or full eight and one half hour "kiosk" shift when the supervisors knew that they had not done so.

37.     From at least January 2015 through February 2019, for example, T. Nee, other officers, and the supervisors of the ECU, submitted dozens of false and fraudulent overtime slips in which they claimed to have worked a full four hour "purge" shift, despite the fact that the Warehouse perimeter alarm was set well before the end of the shift.   Examples include the following (dates and times approximate):

| Date | Warehouse Perimeter Alarm Set | ECU Members Submitting Overtime Slips Claiming to have Actually Worked 4 hours OT in the Warehouse from 4:00 p.m. to 8:00 p.m. |
|---|---|---|
| 3/2/15 | 7:07 p.m. | Capt. A, BPD PO #2, BPD PO #3, BPD PO #4, BPD PO #6, BPD PO #7 |
| 5/27/15 | 6:45 p.m. | Capt. A, BPD PO #2, BPD PO #3, T. Nee, BPD PO #4, BPD PO #8 |
| 6/11/15 | 5:27 p.m. | Capt. A, BPD PO #3, T. Nee, BPD PO #4, BPD PO #8 |
| 7/14/15 | 6:18 p.m. | Capt. A, BPD PO #3, T. Nee, BPD PO #4, BPD PO #7, BPD PO #8 |
| 9/16/15 | 5:09 p.m. | Sgt. D, BPD PO #3, T. Nee, BPD PO #6, BPD PO #7, BPD PO #8 |

| Date | Warehouse Perimeter Alarm Set | ECU Members Submitting Overtime Slips Claiming to have Actually Worked 4 hours OT in the Warehouse from 4:00 p.m. to 8:00 p.m. |
|---|---|---|
| 10/26/15 | 5:20 p.m. | Capt. A, Sgt. C, Sgt. D, BPD PO #1, BPD PO #2, BPD PO #3, T. Nee, BPD PO #7, BPD PO #8 |
| 2/17/16 | 5:36 p.m. | Capt. A, BPD PO #2, BPD PO #3, BPD PO #4, BPD PO #5 |
| 5/11/16 | 5:43 p.m. | Lt. B, Sgt. D, BPD PO #3, T.Nee, BPD PO #4, BPD PO #7 |
| 6/19/17 | 6:12 p.m. | Sgt. F, BPD PO #2, BPD PO #3, BPD PO #5, BPD PO #7, BPD PO#13 |
| 7/11/17 | 6:13 p.m. | Sgt. E, Sgt. F, BPD PO #2, BPD PO #3, BPD PO #7, BPD PO #9, BPD PO #11 |
| 11/22/17 | 5:10 p.m. | Lt. B, Sgt. E, T. Nee, BPD PO #2, BPD PO #9, BPD PO #11, BPD PO #13 |
| 1/31/18 | 6:29 p.m. | Sgt. E, Sgt. F, T. Nee, BPD PO #5, BPD PO #7, BPD PO #9, BPD PO #10, BPD PO #14 |
| 10/4/18 | 5:16 p.m. | Lt. B, Sgt. E, Sgt. F, BPD PO #2, BPD PO #9, BPD PO #12, BPD PO #13 |
| 1/24/19 | 6:12 p.m. | Lt. B, Sgt. E, BPD PO #2, BPD PO #9, BPD PO #10, BPD PO #12, BPD PO #13 |

38. Though supervisors knew that these BPD overtime slips, and others, were false and fraudulent, Captain A, Lieutenant B, and Sergeants C, D, E, and F, all endorsed the false and fraudulent overtime slips for themselves and their subordinates.

39. In addition, from at least January of 2015 through February 2019, T. Nee and the members of the ECU submitted false and fraudulent overtime slips claiming to have worked full eight and one half hour "kiosk" shifts, despite working only a fraction of those shifts.

40. Based upon a comparison of the overtime hours claimed versus the time that the building alarm was set, from at least January 2015 through in or about August 2017, T. Nee personally received more than approximately $16,642 for overtime hours that he did not work.

8

Object and Purpose of the Embezzlement Conspiracy

41. The object of the conspiracy was for T. Nee and his co-conspirators to embezzle funds from BPD, an agency that received federal funding. The purpose of the conspiracy was for T. Nee and his co-conspirators to enrich themselves personally by obtaining payment for overtime hours that they did not work.

Manner and Means of the Conspiracy

42. Among the manner and means by which T. Nee and co-conspirators known and unknown to the United States Attorney carried out the conspiracy were the following:

   a. From at least January 2015 through in or about February 2019, T. Nee and/or his co-conspirators routinely left the Warehouse at least one or more hours before the end of the 4-8 p.m. overtime shift.

   b. From at least January 2015 through in or about February 2019, T. Nee and/or his co-conspirators routinely departed several hours prior to the end of the 6 a.m. to 2:30 p.m. or 7:30 a.m. to 4 p.m. "kiosk" overtime shift.

   c. From at least January 2015 through in or about February 2019, despite leaving early, T. Nee and/or his co-conspirators submitted false and fraudulent overtime slips claiming to have worked the full 4-8 p.m. overtime shift or full eight and one-half hour "kiosk" shift.

   d. From at least January 2015 through in or about February 2019, ECU supervisors, including Captain A, Lieutenant B, and Sergeants C, D, E, and F, knowingly endorsed the false and fraudulent overtime slips of each other and subordinates so that they and their co-conspirators would be paid for overtime

9

hours that they did not work.

Overt Acts in Furtherance of the Conspiracy

43. From at least January 2015 through in or about February 2019, T. Nee and co-conspirators known and unknown to the United States Attorney, committed and caused to be committed the following overt acts in furtherance of the embezzlement conspiracy, among others.

|    | Approximate Date | Overt Acts |
|----|------------------|------------|
| 1  | 3/2/15   | Capt. A submitted a false and fraudulent overtime slip claiming to have worked 4 hours and endorsed fraudulent slips of subordinates |
| 2  | 5/27/15  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 3  | 6/11/15  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 4  | 7/14/15  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 5  | 9/16/15  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 6  | 10/26/15 | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 7  | 2/17/16  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 8  | 5/11/16  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 9  | 7/11/17  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 10 | 11/22/17 | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 11 | 1/31/18  | T. Nee submitted a false and fraudulent overtime slip claiming to have worked 4 hours |
| 12 | 10/1/18  | Lt. B, BPD PO #2, BPD PO #10, BPD PO #12 submitted false and fraudulent overtime slips claiming to have worked 4 hours |
| 13 | 1/24/19  | Lt. B, Sgt. E, BPD PO #2, BPD PO #9, BPD PO#10, BPD PO #12, BPD PO #13 submitted false and fraudulent overtime slips claiming to have worked 4 hours |

## COUNT ONE
### Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds
### (18 U.S.C. § 371)

The United States Attorney charges:

44. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 43 of this Information.

45. From at least January 2015 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendant,

### THOMAS NEE,

conspired with others known and unknown to the United States Attorney, to commit an offense against the United States, to wit: theft concerning programs receiving federal funds, that is, being an agent of an organization, namely, the Boston Police Department, to embezzle, steal, obtain by fraud and otherwise without authority knowingly convert to the use of a person other than the rightful owner and intentionally misapply, property valued at $5,000 or more, that was owned by, and was under the care, custody, and control of the Boston Police Department, which received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(A).

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Theft Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(1)(A); 18 U.S.C. § 2)

The United States Attorney further charges:

46. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 43 of this Information.

47. From at least January 2015 through in or about February 2019, in the District of Massachusetts and elsewhere, the defendant,

THOMAS NEE,

being an agent of an organization, the Boston Police Department, embezzled, stole, obtained by fraud and otherwise without authority knowingly converted to the use of a person other than the rightful owner and intentionally misapplied, property valued at $5,000 or more, that was owned by, and was under the care, custody, and control of the Boston Police Department, which received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## FORFEITURE ALLEGATION
## (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))

The United States Attorney further alleges:

1. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 371 and 666, set forth in Counts One and Two, the defendant,

THOMAS NEE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes, or is derived from, proceeds traceable to the offenses.

2. If any of the property described in paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred to, sold to, or deposited with a third party;
   c. has been placed beyond the jurisdiction of this Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of all other property of the defendants up to the value of the property described in paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981 and Title 28, United States Code, Section 2461(c).

NATHANIEL R. MENDELL<br>
ACTING UNITED STATES ATTORNEY

*Mark Grady*
Mark Grady<br>
Assistant United States Attorney

Date: 9.13.21