UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | No. 21-cr-10294-RGS |
| ) | |
| THOMAS NEE,   ) | |
| ) | |
| Defendant   ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

For the reasons below, the government respectfully requests that the Court sentence the defendant to time served (one day) followed by three years of supervised release, a fine within the guidelines (unless the court finds he cannot pay), restitution of $16,642, and a $200 special assessment.

### FACTS

### The Evidence Warehouse

The Boston Police Department leases two buildings located at 1555 Hyde Park Avenue in Hyde Park which serve as the Boston Police Evidence Warehouse. Sworn police officers assigned to the warehouse, which include approximately ten members of the Evidence Control Unit ("ECU") work from 7:30 a.m. to 4:00 p.m. Mondays through Fridays. The members of the ECU include a Lieutenant or Captain, two Sergeants, and five or more police officers.

The members of the ECU control access to the warehouse and their duties include: storing and cataloging new evidence, including drug evidence, retrieving evidence for use in court, and transporting the evidence when necessary.

1

**Purge Overtime**

In or around 2011, the ECU ran out of space for new evidence. The BPD consequently approved a program called "purge overtime," which allowed ECU officers to work an overtime shift to dispose of old and unneeded evidence, organize the evidence at the warehouse more efficiently, scan older evidence into newer computer systems so that it can be tracked more effectively, and thereby create space for the intake of new evidence. This purge overtime shift ran from 4 p.m. to 8 p.m., most often Monday through Thursday, and was performed by four or more ECU line officers (patrolmen/patrolwomen) and one or more supervisors (either a sergeant, lieutenant, or captain). Because purge overtime followed the officers' regular shift, it was paid on an hour-for-hour basis, in 15-minute increments. Additionally, because purge overtime required officers to manually sort evidence, purge overtime could not be performed remotely.

Overtime hours are reported using an overtime slip, an example of which is shown below, which requires officers to state their name, overtime purpose, start time, end time, and actual hours worked. The overtime slips must be signed by the employee working overtime as well as the supervisor and commander, and an overtime slip must be submitted for each and every overtime shift. Notably, BPD's overtime slip—in bold and underline—asks BPD employees to list the "Actual Hours Worked" for each overtime shift:

[Boston Police Overtime Authorization/Record form for Nee Thomas, I.D. 009775, Rank 09, Unit 32020, OT Code 332, Purpose: PURGE, Location: ECU, OT Call Sign: SEV, Start Time 16:00, End Time 20:00, Actual Hours Worked: 04:00, Start Date 1/22/2017, End Date 1/22/2017, Supervisor: O'Brien I.D. 000294 Rank 07, Commander: Torgiow I.D. 009807 Rank 05, District/Unit 32000, Form# 0003-BAT-0504]

On this particular day, November 22, 2017, Nee (along with others performing the "purge" overtime) claimed to have worked from 4-8 p.m.  Nee is representing that he worked 4–8 p.m. (1600-2000), in the warehouse "ECU," and that he "actually worked" 4 hours of overtime.  Contrary to what was represented in this overtime slip, the alarm records show that Nee and the other officers of the ECU left at 5:10 p.m. (more than two hours early).  PSR, ¶19.

Overtime slips have to be signed by an individual holding higher rank.  There are two signatures for supervisors, one for the supervisor who certified that the hours were actually worked, and one for the supervisor empowered to authorize the overtime.  For the members of the ECU, Captain Evans, Lt. Torigian, or one of the sergeants would most often sign the slips.  Slips could also be signed by BPD commanders at Headquarters.

## BPD Warehouse Alarms

The BPD Warehouse is extensively alarmed, with alarms on each outer door, separate alarms on various trailers and safes within the building, and, internal motion sensors.  Once the perimeter alarm is set, any person inside the building would either trigger the motion sensors, or, would have to disarm the alarm in order to exit the building.  Data from the alarm system, including when it was set and disarmed on a given date, and by whom, was maintained by the City of Boston.

## The Criminal Conspiracy

From at least January 2015 through in or about February 2019, Nee and co-conspirators conspired to be paid for hours they did not work by submitting false and fraudulent overtime slips in which they claimed to have worked a full "purge" overtime shift when in fact they did not.  Supervisors in the ECU, such as Captain Richard Evans, Timothy Torigian, and Sergeants George Finch, Robert Twitchell, and Gerard O'Brien, routinely agreed to endorse overtime slips

3

for themselves and their subordinates certifying that they and their subordinates had worked a full four hour "purge" shift when the supervisors knew that they had not done so.  *See* Case No. 21-10161-PBS - Rule 11 Transcript, [D. 50], p. 20-21.[1]

From at least February 2015 through February 2018, which is the relevant time period in which Nee was assigned to the Warehouse, Nee and the officers of the ECU submitted hundreds of false and fraudulent overtime slips in which they claimed to have worked a full four hour "purge" shift, despite the fact that the Warehouse perimeter alarm was set well before the end of the shift.  Though supervisors knew that these BPD overtime slips, and others, were false and fraudulent, supervisors endorsed the false and fraudulent overtime slips.

## Government's Loss Calculation

The loss attributed to individual officers was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working.[2]  Based upon a comparison of the overtime hours claimed versus the time that the building alarm was set, from at least February 2015 through in or about February 2018, Nee personally received approximately $16,242 for overtime hours that he did not work.  During the tenure of Nee from at least February 2015 through in or about February 2018, the members of the conspiracy received approximately $257,881 for overtime hours that they did not work.

---

[1] Lieutenant Torigian, Sgt Twitchell, and two other charged officers were acquitted after trial.

[2] This methodology was laid out in testimony of an FBI forensic accountant in two separate trials.  *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65.

**Advisory Sentencing Guidelines**

A.   **Government's Calculation**

The government's position with respect to the Sentencing Guidelines are set forth in the Plea Agreement [D. 2], p. 2:

a) Defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of less than 20 years (USSG § 2B1.1(a)(2));
b) Defendant's offense level is increased by 12, because the reasonably foreseeable loss is greater than $250,000 but less than $550,000 (USSG § 2B1.1(b)(1)(G));
c) Defendant's offense level is increased by 2, because defendant abused a position of trust, (USSG § 3B1.3); and
d) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crimes, and has timely notified authorities of his intention to plead guilty thereby permitting the government and the Court to allocate their resources efficiently (USSG § 3E1.1).

The government's plea agreement predates the adoption of the "zero point" Guideline, USSG §4C1.1.  The government agrees with Probation that Nee should benefit from that Guideline, which would result in an additional 2 point reduction.  The government has, thus, calculated the total offense level to be 15.  Nee's criminal history category is I, which results in a GSR of 18-24 months' imprisonment.

B.   **Probation's Calculation**

Probation's calculation differs from the government's in one material respect.  PSR, ¶38, 46 and Objections, p. 33.  Probation has concluded that the entirety of the loss during Nee's tenure cannot be attributed to him. Instead, Nee could only reasonably foresee fraud of co-conspirators occurring on days when Nee actually worked, and left early from, a purge shift.  PSR, Objections, p. 33.  The total amount of loss attributable to Nee for losses incurred during shifts that Nee, himself, worked, has been calculated to be $110,889.

Probation has calculated the total offense level to be 11. PSR, ¶46. Pursuant to that calculation, Nee's criminal history category is I, which results in a GSR of 8-14 months' imprisonment.

### C.  Defendant's Objection

On July 2, 2024, the defendant sought an adjustment of the loss amount citing a provision of the collective bargaining agreement. In this regard, the defendant asserted that no "purge" loss should be attributed for the following dates: April 14, 2015, June 8, 2015, June 9, 2015, June 10, 2015, June 11, 2015, November 3, 2015, November 4, 2015, November 12, 2015, January 14, 2016 and May 4, 2016. There is only a dispute as to loss attributed on five days:[3] June 11, 2015, November 4, 2015, November 12, 2015, January 14, 2016 and May 4, 2016. The total amount of loss attributed to Nee on the disputed days, combined, is $491.

## ARGUMENT

### I.  Guidelines Calculations

#### A.  Loss Amount

The government believes that a Guidelines loss amount of $257,881 is appropriately attributed to Nee based upon the loss to BPD resulting from the purge overtime scheme during Nee's tenure. This is not all of the conspiracy wide loss, merely that which occurred during the time period in which Nee was working purge overtime.

Probation has taken a narrower view. Probation does not believe that loss occurring pursuant to this scheme on days that Nee did not work a purge overtime shift can be attributed to him as "reasonably foreseeable." In declining to attribute the remaining loss, Probation relates,

---

[3] No loss was attributed to the defendant on April 14, 2015, June 8, 2015, June 9, 2015, June 10, 2015, or November 3, 2015.

"[t]here is insufficient evidence to hold defendant accountable for loss that wasn't specifically known to him, incurred as part of jointly undertaken criminal activity, or reasonably foreseeable to him." PSR, Objections, p. 33. Instead, Probation believes that fraudulent overtime slips submitted by co-conspirators on days when Nee worked, represent foreseeable loss (a figure of approximately $110,889).

The government believes that Probation has applied the "reasonably foreseeable" standard too restrictively in this matter. Based on the facts, both the Guidelines and caselaw dictate a conclusion that the losses attributable to Nee's co-conspirators during his time participating in the conspiracy represent jointly undertaken criminal activity, which was within the scope of the agreed criminal activity, occurred in furtherance of that agreed criminal activity, and were reasonably foreseeable to Nee.

As a starting point, this charge involves a conspiracy, the very definition of a jointly undertaken criminal activity, or, as the Guidelines provide, "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others." U.S.S.G. § 1B1.3(a)(1)(B). In the case of jointly undertaken activity, the court "must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a defendant." *United States v. Codarcea*, 505 F.3d 68, 72 (1st Cir. 2007); USSG §1B1.3(a)(1)(B). "This task requires the court to ascertain what activity fell within the scope of the specific conduct and objectives embraced by the defendant's agreement. The court must then determine to what extent others' acts and omissions ... would have been foreseeable by a reasonable person in defendant's shoes at the time of his or her agreement." *Id*. *See also, United States v. Delima*, 886 F.3d 64, 73 (1st Cir. 2018).

With respect to the scope and objectives of the agreement, Nee agreed to engage in a scheme with his co-conspirators to defraud the BPD utilizing fraudulent purge overtime submissions made during his tenure at the Evidence Warehouse, which lasted from at least February 2015 through February 2018.  [D. 34], p. 19-22.  Nee's agreement to join in this criminal conduct spanned his entire tenure, not merely the days he personally worked a purge over time shift.  The conduct at issue, the submission of fraudulent overtime slips by co-conspirators during Nee's tenure, "f[a]ll[]s within the scope of the specific conduct and objectives embraced by the defendant's agreement." *Cordaracea, supra*.  The fraudulent overtime slips, whether submitted by Nee, or, someone else, were submitted in furtherance of the conspiracy they all joined to steal money from the BPD.

The members of the ECU, both supervisors and officers, were aware of the hours and frequency of the purge overtime shift (Mon.-Thurs., 4-8pm).  Officers and supervisors participating in this conspiracy were aware that they were consistently working two hours or less of those shifts, but lied about it.  All of the participants were aware that everyone was leaving early.  And this conduct occurred on hundreds of occasions, over years.  This was one unit, working at one single location, engaged in the same scheme to steal money from the BPD by submitting fraudulent overtime slips for the 4-8pm purge overtime shift.  Nee's familiarity with the conspiracy's goals and methods are exactly the type of evidence that supports a finding of "reasonably foreseeability."  As observed by the First Circuit, emphasis in original:

> foreseeability may be established … by a defendant's knowledge of *the nature and extent of a conspiracy in which he is involved*. … It is both good law and good logic that a defendant's awareness of the inner workings of a conspiracy in which he is participating is germane to, and often highly probative of, accomplice attribution. Although appellant may choose to characterize such intimate knowledge as "mere awareness"-a term that we view as verging on the oxymoronic in a case like this one-he is fishing in an empty stream. Such

>knowledge frequently will suffice to prove the defendant's ability to foresee the acts of coconspirators.

*United States v. LaCroix*, 28 F.3d 223, 229 (1st Cir. 1994) (emphasis in original).  It was eminently foreseeable to Nee that his co-conspirators, working exactly the same overtime purge shifts, at exactly the same location, often with exactly the same co-conspirators, would engage in exactly the same conduct that Nee himself did with them, i.e., leaving early from the purge shift and collectively lying about it.

It is difficult for the government to believe that Nee did not know, let alone that Nee could not reasonably foresee, that his co-conspirators would do exactly what they did with Nee and exactly what they all agreed to do with each other.   Conversely, it makes little sense to the government to believe that Nee, leaving purge shifts with his co-conspirators on Monday and Thursday on a given week at 6pm, could not foresee that those same co-conspirators would also leave at 6pm from the same overtime shift on Tuesday and Wednesday.  Especially so, when this conduct (and Nee's own participation in it) occurred on hundreds of occasions, over years.

The evidence in this matter supports the inference that Nee knew exactly what his co-conspirators were doing (even when he was not present).  But that inference isn't even required to support a finding of loss.  "Reasonable foreseeability is broader than knowledge." *United States v. Ford*, 73 F.4th 57, 66 (1st Cir. 2023).[4]   In the drug context, the First Circuit has not hesitated to uphold attribution of narcotics sold at a location even where members of a

---

[4] Indeed, in the context of fraud schemes, the First Circuit has upheld a finding that conduct broader than that undertaken by a specific defendant can be *foreseeable* under Section 1B1.3.  *See United States v. Iwuanyanwu*, 69 F.4th 17, 22 (1st Cir. 2023) (concluding that it was reasonably foreseeable to a defendant who used "fraudulent corporate documents to open bank accounts used to perpetrate … fraud" that other members of the conspiracy "could use false identities when opening additional bank accounts in furtherance of the conspiracy" even where that defendant used only his own name).

conspiracy were not present on a given day. "It was *surely foreseeable* to Lugo that his coconspirators would continue to sell drugs at El Faro even on days when Lugo himself was not actively selling." *United States v. Walker-Couvertier*, 860 F.3d 1, 18–19 (1st Cir. 2017) (emphasis added). Just so, here.

In the view of the government, the fact that his co-conspirators would engage in exactly the same conduct Nee agreed to engage in with them, *i.e.,* lying about working a full purge overtime shift, was entirely foreseeable – even on days Nee, himself, did not work. *See Walker-Couvertier, supra*. Thus, this represents conduct: that was within the scope of the agreement Nee entered into with his co-conspirators, USSG §1B1.3(a)(1)(B)(i); in furtherance of the conspiracy, USSG §1B1.3(a)(1)(B)(ii); and wholly foreseeable to Nee, USSG §1B1.3(a)(1)(B)(iii). The entire loss to the BPD during his tenure from the fraudulent purge overtime submissions should be attributed to Nee under USSG §1B1.3(a)(1)(B).[5]

## II. Government's Sentencing Recommendation

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; as well as the information provided in the government substantial assistance motion, dictate a sentence of one day deemed served, a three year term of supervised release, a fine within the Guideline sentencing range calculated by the

---

[5] The specific figures supporting the government's estimate are detailed in Exhibit 1, hereto. The loss was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working. This methodology was laid out in testimony of an FBI forensic accountant in two separate trials. *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65. For public filing, the exhibit has been redacted to remove names of uncharged individuals (though the unredacted chart is in the PSR).

Court (unless the Court finds that the Defendant is not able to pay a fine) and the payment of $16,642 restitution to the BPD.

Undoubtedly, that this defendant, as a police officer, chose to break, rather than uphold, the law, is indefensible. But, a defendant's assistance to authorities in the investigation of criminal activities has long been recognized as a mitigating sentencing factor. The nature of the assistance provided by this defendant, including public testimony in a criminal trial, was exceptional. *See United States v. Torigian et al*, 20-10164-NMG [D. 384], Trial Transcript, p. 65-149; [D. 367] Trial Transcript, p. 4-36. This defendant's cooperation was instrumental in bringing to light extensive corruption within the Boston Police evidence warehouse.

In light of the cooperation, including that more fully detailed in the government's sealed Memorandum in support of a sentencing reduction under USSG §5K1.1, the government requests that the Court sentence the defendant to time served (one day) followed by three years of supervised release, a fine within the guidelines (unless the court finds he cannot pay), restitution of $16,642, and a $200 special assessment.

          Respectfully submitted,

          JOSHUA S. LEVY
          Acting United States Attorney

By:    /s/ Mark J. Grady
          Mark J. Grady
          Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served via ECF notice.

          /s/ Mark J. Grady
          Mark J. Grady
          Assistant U.S. Attorney